# JOHN O'CONNOR, Respondent, v. ST. LOUIS AMERICAN LEAGUE BASEBALL COMPANY, Appellant.

**St. Louis Court of Appeals. Argued and Submitted December 9, 1915. Opinion Filed January 4, 1916.**

1. **APPELLATE PRACTICE: Breach of Contract: Nature of Action: Conclusiveness of Verdict.** An action by an employee for the breach of a contract of employment, by reason of his wrongful discharge before the expiration of the contract, is an action at law, notwithstanding defendant pleads fraud on the part of plaintiff as justification for the discharge; and hence a verdict rendered on conflicting evidence in such an action is conclusive, on appeal.

2. ———: **Conclusiveness of Verdict.** While a verdict rendered on conflicting evidence, in an action at law, is conclusive on the appellate court, the court may review the evidence to determine whether there is substantial evidence to sustain the verdict.

3. **MASTER AND SERVANT: Discharge of Servant: Faithful Performance of Duties: Question for Jury.** In an action for the breach of a contract employing plaintiff to manage defendant's professional baseball club, by the wrongful discharge of plaintiff before the expiration of the contract, defended on the ground that the discharge was justified by reason of the fact that plaintiff violated the contract and brought the game of professional baseball into disrepute, by giving instructions to one of his players to station himself out of his usual position while a certain player on an opposing club was at bat, so that such player, who was in a close race with another player for the honor of being the leading batter in the league, was thereby enabled to make base hits he otherwise would not have made and thus increased his batting average, *held* that there was no substantial evidence to establish this defense, and hence the verdict, in so far as it found there was no legal ground for the discharge of plaintiff, was fully warranted.

4. ———: ———: ———: ———. In an action by an employee for the breach of a contract of employment, by reason of his wrongful discharge before the expiration of the contract, where the employer pleads that the employee violated his duty and was unfaithful to the employer, and hence the discharge was

justified, it is a question for the jury to determine, whether the doing of a particular act was in violation of the employee's duty and tended to injure the employer.

5. ———: **Contract of Employment: Mutuality.** A contract of employment which recited that the employment was for two certain years and required the employer to pay the employee the stipulated compensation during both years, but which, in a subsequent clause, obligated the employee to perform services during the first year only, could not be held to lack mutuality of obligation, so as to prevent the employee from recovering compensation for the second year, upon his being wrongfully discharged, where the jury found, under sufficient evidence, that the true agreement between the parties was, that the employment was for two years.

6. ———: ———: ———. In view of the fact that the first clause of such contract provided for employment for two years, the latter clause, which provided for the performance of services for only one year, and was thus in irreconcilable conflict with the first clause, will be rejected, and accordingly, independent of parol evidence as to the intent of the parties, the contract will be construed as providing for employment for two years, under the rule that where two clauses of a contract are repugnant, the first will stand and the last will be rejected.

7. **CONTRACTS: Construction.** A contract is to be construed most strongly against the person who drew it.

8. ———: ———. Where two clauses of a contract are repugnant and cannot stand together, the first will stand and the last will be rejected.

9. **APPELLATE PRACTICE: Harmless Error.** Where the finding of the jury with respect to a contract that contains repugnant clauses is in accord with what the court should have declared as a matter of law, the losing party will not be heard to complain, on appeal, that the court should have construed the contract itself and should not have admitted evidence as to the intent of the parties.

10. **TRIAL PRACTICE: Motion to Strike: Time.** A motion to strike out testimony, made after the testimony is given without objection, comes too late.

11. **CONTRACTS: Construction.** Where a contract is equivocal, a recognized canon of interpretation is to seek out the construction the parties to the contract placed upon it themselves, and apply that.

12. **MASTER AND SERVANT: Contract of Employment: Construction of Parties.** A contract of employment recited that the employment was for two years at a stipulated salary. A

O'Connor v. Baseball Co.

subsequent clause obligated the employee to perform services during the first year only. At the end of the first year, after summoning the employee to explain a complaint concerning his conduct, the employer notified him that it had "elected to terminate its contract" with him. *Held*, that, by this action, the employer construed the contract as being for two years, by which construction it is bound.

Appeal from St. Louis City Circuit Court.— *Hon. Geo. C. Hitchcock,* Judge.

AFFIRMED.

*Stewart, Bryan & Williams* for appellant.

(1) The relationship which exists between master and servant is one of peculiar trust and confidence, and where in an action by the servant for breach of a contract of employment the master pleads facts constituting a fraud on that relationship as a justification for the servant's discharge, the issue on such fraud is equitable in its nature and an appellate court will not consider itself bound by the findings of the court or jury below, but will review all of the evidence of the fraud. Dennison & Co. v. Aldrich, 114 Mo. App. 700, 708; Bevin v. Powell, 83 Mo. 365; Page v. Dixon, 59 Mo. 43; Ridge v. Greenwell, 53 Mo. App. 479. (2) Where a servant does an act which injures or has a tendency to injure his master's business, such an act is a sufficient justification for the discharge of the servant irrespective of fraud, and it is not necessary to show that his act caused actual loss to his master, if it appears that the master is likely to be damaged by the act complained of. 26 Cyc. 988; Wade v. William Barr Dry Goods Co., 155 Mo. App. 405; Alexander v. Potts, 151 Ill. App. 587; Robinson v. Western Union Telegraph Co., 169 Mich. 503, 517; Wright v. Lake, 48 Wash. 469; Priestman v. Bradstreet, 15 Ont. 558. (3) A contract which binds only one party is void for lack of mutuality of obligation. Laclede Con-

struction Co. v. Tudor Iron Works, 169 Mo. 137; Campbell v. American Handle Co., 117 Mo. App. 19; Underwood Typewriter Co. v. Century. Realty Co., 118 Mo. App. 197; Eaton v. Wear Coal Co., 125 Mo. App. 194; Cal Hirsch & Sons Iron Co. v. Railroad, 148 Mo. App. 173; 9 Cyc. 327; Case note, 20 L. R. A. (N. S.) 899; Lawrence v. Dixey, 119 N. Y. App. Div. 295; Cincinnati Exhibition Co. v. Marsans, Cause No. 4562, U. S. District Court for Eastern District of Missouri (not yet reported). (4) A contract which is void on its face, or which differs from the one pleaded, is not admissible in evidence. A party cannot recover on° a void instrument, nor can he sue on one cause of action and recover on another. Laclede Construction Co. v. Tudor Iron Works, 169 Mo. 137; Cal Hirsch & Sons Iron Co. v. Railroad, 148 Mo. App. 173; Merryman v. Buddecke, 243 Mo. 205; Barber v. Ozark Improvement Co., 131 Mo. App. 717; Jenkins v. Clopton, 141 Mo. App. 74; Taylor v. Sebastion, 158 Mo. App. 147. (5) Where by reason of mistake a contract is defective or fails to express the real intention of the parties, the remedy is in equity for reformation, and before either party can recover upon it in an action at law the equitable remedy for reformation must first be invoked in the same or a separate proceeding. 34 Cyc. 971; Spelman v. Railroad, 187 Mo. App. 119; Campbell v. Johnson, 44 Mo. 247; McClurg v. Phillips, 49 Mo. 315; Turner v. Railroad, 114 Mo. App. 539; Ætna Life Insurance Co. v. American Fire, Etc., Co., 169 Mo. App. 550. (6) Where an ambiguity appears on the face of an instrument, such ambiguity is patent, the contract must be construed by the court itself, and oral testimony of the intentions and prior negotiations of the parties is inadmissible. Case Note, 6 L. R. A. 41; Mudd v. Dillon, 166 Mo. 110; McCormack v. Parsons, 195 Mo. 91; Martin v. Kitchen, 195 Mo. 477; Campbell v. Johnson, 44 Mo.

247; Bradshaw v. Bradbury, 64 Mo. 334; Donnell Newspaper Co. v. Jung, 81 Mo. App. 577; Romine v. Haag, 178 S. W. 147. (7) Where a master defends his servant's suit for breach of the contract of employment on the ground that the servant committed an act which tended to injure the reputation and business of the master, it is error not to admit evidence of the extent to which publicity was given to the act. The extent of publication may always be shown in cases where injury to reputation is involved. 25 Cyc. 506; Case Note, 20 L. R. A. (N. S.) 361. (8) Newspaper reports of a baseball game are admissible in evidence when it is shown that they are based on reliable sources of information. Fountain v. Railroad, 114 Mo. App. 676; Brandon & Woolwine v. Railroad, 134 Mo. App. 89; Priddy v. Boice, 201 Mo. 309.

*Horace L. Dyer* and *Walter N. Davis* for respondent.

(1) A servant can only be discharged for cause. Beggs v. Fowler, 82 Mo. 599; Suggs v. Blow, 17 Mo. 359. (2) Where the facts are unconceded the right to discharge the servant is for the jury. Wade v. Wm. Barr Dry Goods Co., 177 S. W. 668; 26 Cyc. 1009. (3) (a) It has been laid down as an elementary rule of law that if two clauses of a contract are so totally repugnant to each other that they cannot stand together the first shall be received and the latter rejected. Royle Mining Co. v. Fidelity & Casualty Co., 126 Mo. App. 104; Wisconsin Marine Ins. Co. v. Wilken, 95 Wis. 111; Bean v. Ætna Life Ins. Co., 111 Tenn. 186; Straus v. Wannamaker, 175 Pa. St. 213; Benjamin v. McConnell, 4 Gilman, 536, 46 Am. Dec. 474; Jackson v. Ireland, 39 Wend. 99; Harting v. Witte, 59 Wis. 285; Wells v. Ferguson, 28 Alk. 463; Jones v. Casualty Co., 140 N. C. 262, 5 L. R. A. (N. S.) 932; Employers' L. Assurance Co. v. Morrow, 143 Fed. 750, 74

C. C. A. 640. (b) Although the latter part of a contract is irreconcilable with the former upon any reasonable construction, it ought to aid in the construction of the whole even though inconsistent therewith. Knower v. Emerson, 9 Pick. 422. See 60 A. S. R. 86. (c) Although on its face and by its expressed terms the contract is obligatory upon one party only, yet if the intention of the parties and the consideration upon which the obligation is assumed is that there shall be a correlative obligation on the other side, the law will imply it. Glover v. Henderson, 120 Mo. 378; Lewis v. Atlas M. L. I. Co., 61 Mo. 534; Laclede Construction Co. v. Tudor Iron Works, 169 Mo. 1237; 9 Cyc. 333. (d) However, in construing contracts the better rule is that the court will ascertain the true intentions of the parties as gathered from the whole instrument. St. Louis v. Railroad, 228 Mo. 736; Meyer v. Christopher, 176 Mo. 580; Bent v. Alexander, 15 Mo. App. 181; Interurban Const. Co. v. Hays, 191 Mo. 248. (e) While contemporaneous parol evidence may not be allowed to vary, contradict or add to the terms of a contract, it may be allowed to show the true intentions of the parties, and in case of doubt all negotiations between the parties ought to be considered in giving the contract a construction. Laclede Const. Co. v. T. J. Moss Tie Co., 185 Mo. 25. (f) In order to make parol evidence or a term of a contract inadmissible the written contract must be complete on its face, free from ambiguity and not contradictory of itself. Parol evidence of the true understanding and meaning, circumstances, and reason for making the contract is admissible. Pittsburg Steel Co. v. Cottengin, 179 Mo. App. 392. (g) When a contract is fairly opened to two interpretations, one favorable to the party who wrote it and the other to the opposite contracting party, then that construction will be adopted which is most favorable to the latter. Ambiguous

terms in a contract are always to be construed against the party using them. Belch v. Schott, 171 Mo. App. 357; Big Muddy C. & I. Co. v. Coal Co., 176 Mo. App. 407. (h) When a contract depending upon extrinsic unconceded facts contains ambiguous phrases, the construction is for the jury. Smith v. Crane, 169 Mo. App. 695; Thetford v. Ins. Corporation, 140 Mo. App. 254; Wheeles v. Grocer Co., 140 Mo. App. 572. (i) The construction placed upon a contract by the parties is of great weight. Tetley v. McElmurray, 201 Mo. 382; Meyer v. Christopher, 176 Mo. 580; Williams v. Railroad, 153 Mo. 487. (j) Even though the court should hold that the contract must be construed by the court, yet the admission of oral testimony showing the intentions and prior negotiations of the parties was harmless, for if the contract has mutuality, the court must of necessity have instructed the jury that the contract included the season of 1911. (k) The jury was required to find from all the evidence as a fact that the contract included the season of 1911 before plaintiff could recover. (4) Defendant has saved no exceptions to its point 7, as reading the record on pages 85 and 86 will show. Not having saved exceptions, plaintiff will be deemed to have waived them. (5) Defendant cannot complain of its point 8, for defendant did not offer in evidence the newspaper reports of the baseball game. Upon cross-examination witness, Collins, said that he would swear, after having refreshed his memory, that McGuire was hit. Such evidence is not admissible except by living witnesses or the inability to procure them.

STATEMENT.—Plaintiff below, respondent here, for cause of action against defendant, appellant here, avers that on the —— day of October, 1909, he and defendant entered into a contract wherein and whereby defendant agreed to employ plaintiff as manager of the St. Louis American League Baseball Club for a

period of two years, namely, the years 1910 and 1911, at a salary of $5000 a year, payable in semi-monthly installments during the seasons of said two years; that in pursuance of the terms of the contract plaintiff entered upon his duties as manager of the St. Louis American League Baseball Club and defendant paid him his salary to the amount of $5000 for the season of 1910; that on November 29, 1910, without just cause or reason, defendant discharged plaintiff and refused to allow him to continue as manager of the Baseball Club. Averring that ever since the date last named he has been ready, able and willing to perform his duties as manager of the ball club under the terms of the contract but that defendant, wholly disregarding its duties in the premises, has failed and refused to allow plaintiff to continue as manager of the club and, although often requested, has failed and refused and neglected to pay plaintiff the balance of $5000 due him under the terms of the contract, plaintiff demands judgment for that amount, interest and costs. By an amended answer on which the cause went to trial, after a general denial, defendant sets up that it entered into a written contract with plaintiff which expired on or about October 15, 1910, on which date the services of plaintiff, under the terms of the contract, were terminated and at an end; that under the terms of the contract and as a consideration upon which plaintiff was entitled to receive compensation, plaintiff was required to render faithful performance to defendant of the duties of his employment; that the St. Louis American League Baseball Company is composed of eight corporations, located in eight of the principal cities of the United States and collectively known as the American League of Professional Baseball Clubs, and that defendant, as a member of the League, engaged annually in a series of baseball games under a schedule of play arranged by

the League and was so engaged in the playing of the schedule during the playing season of 1910, the closing series of games for the season of 1910 in the American League at St. Louis being played between defendant and a team in the League representing the city of Cleveland. (It may be noted here that the St. Louis aggregation is known as "The Browns," and that representing the city of Cleveland is referred to in the record as the Cleveland.) It is further averred in this amended answer that the game of baseball as played by both professionals and amateurs was and is the national sport in the United States; that it is a game which, as played professionally, attracts many spectators, involves large investments and depends for popularity and upon financial returns upon the success of the teams in winning games and the good faith of the players in exercising their best efforts at all times and against all competitors to put forth their best endeavor in playing honest baseball; that careful detailed compilations are made and kept in the American League of the games lost and won by each club and the standings of the several clubs is determined by the percentage of the games lost or won and on this percentage the several clubs in the league are given their respective rank; that detailed statistics are also compiled and kept of the playing records of each individual player in the several clubs and in the League and the players ranked accordingly both as to their ability in fielding and in batting; that in the season ending on or about October 15, 1910, there was keen rivalry in the American League for highest honors in batting average between one Cobb, a player in the League, playing with the team representing the city of Detroit, and one Lajoie, playing with the team representing the city of Cleveland in the League; that the final series between the teams representing the city of Cleveland and defendant was

played at Sportman's Park in the city of St. Louis in
October, 1910; that the last two games of the series
were played on or about October 9, 1910, and were
played on the same afternoon; that during the play-
ing of these two games and during the season begin-
ning on or about April 15, 1910, and ending on or
about October 15, 1910, plaintiff was acting as the
manager of the players representing the defendant
club (the Browns); that plaintiff was desirous of fa-
voring Lajoie, who played the position of second base-
man on the Cleveland team, in his contest for batting
honors with Cobb of the Detroit team, and to the end
that Lajoie might be successful in making the high-
est average for batting honors in the League and in
making a higher percentage than Cobb, unmindful and
in disregard and in violation of his duties, plaintiff
instructed one Corriden, who played the position of
third baseman of the defendant club, to play so far
back of his regular and ordinary position as third
baseman as to allow Lajoie to make what are known
as "base hits," which Lajoie could not and would not
have made had it not been for the instructions by
plaintiff to Corriden; that as a result of the instruc-
tions so given, and as a result of Corriden not playing
his ordinary and regular position as third baseman,
Lajoie succeeded in the two games so played in mak-
ing six base hits; that the balls so struck by Lajoie
were what is known as "bunted" balls and all of the
balls so hit by Lajoie could have been properly fielded
and Lajoie would not have made the base hits had it
not been for the position in which Corriden was so
playing under the instructions of plaintiff; that by
giving these instructions to Corriden plaintiff violated
his contract with defendant and brought the game of
professional baseball into disrepute in the city of St.
Louis and throughout the country, and because of his
unfaithful act under his contract, plaintiff was given

his unconditional release from the employment of defendant, and that if plaintiff had a contract with defendant for the playing season of 1911, which defendant denies, the conduct and behavior of plaintiff, as above set out, forfeited his further right to employment by defendant and entitled defendant to dispense with the further services of plaintiff.

A reply was filed to this amended answer, admitting that under the terms of the contract and as a consideration upon which plaintiff was entitled to receive compensation, he was required to render faithful performance to defendant of his duties under the contract, and that defendant is one of eight corporations, together constituting what is known as the American League of Professional Baseball Clubs, but denying each and every other allegation in the amended answer.

Trial was before the court and a jury.

The original contract or duplicate thereof between the parties was not produced, plaintiff apparently having filed with his petition a printed form of contract entered into between defendant and some other player, but in the course of the trial defendant produced what purported to be a copy of the original contract between plaintiff and defendant, and which was admitted to be a copy of the original contract, defendant being named in it as party of the first part and plaintiff as party of the second part. Shown the blank form of the contract, plaintiff said he thought it was the same kind of form, with one clause stricken out (not here material); that he, when he met Mr. Hedges and they discussed the matter of his employment, then agreed on salary but the hitch was over the term of employment; that he would not sign up until Mr. Hedges agreed to give him a two-years contract. The paper produced by defendant was agreed to be a copy

of the one signed by the parties. As far as necessary to set it out, that contract provides in the first clause thereof, that in consideration of the faithful performance by plaintiff of the conditions, covenants, undertakings and promises hereinafter in the contract set out, "including the option in first party to terminate this contract, the said party of the first part agrees to pay unto second party the sum of *five thousand dollars* per season, *for 1910 and 1911,* payable as follows:" (Here follow provisions for payment of salary in semi-monthly installments, etc., not here pertinent.) By the second clause the party of the second part (plaintiff) agrees to perform for the party of the first part, and for no other party, during the period of the contract, unless with the consent of the party of the first part, such duties pertaining to the exhibition of the game of baseball "as may be required of him by said party of the first part, at such reasonable times and places as said party of the first part may designate, for the American League season for the year *1910,* beginning on or about the *1st* day of *April, 1910,* and ending on or about the *15th* day of October, *1910,* which period of time shall constitute the life of this contract, unless sooner terminated in accordance with the further provisions of this contract." The remaining clauses are not material.

It was in evidence and admitted that the blank which was used in preparing this contract was produced by Mr. Hedges, the president of defendant, was signed by him for the St. Louis Baseball Club and by plaintiff, and that it was a regular form, all printed except the words and figures we have underscored, these being filled in in ink by Mr. Hedges. It is dated October 14, 1910. When offered in evidence by plaintiff, counsel for defendant objected to its introduction. Upon what grounds the objection was based is not stated. The objection was overruled, defendant ex-

cepting, and the contract read in evidence. After it had been read in evidence, counsel for defendant asked that it be stricken out because it "is not the contract relied upon in the allegations of the petition." This was overruled, defendant excepting.

Plaintiff testified that he entered upon the discharge of his duties under the contract, being assigned to the position as manager of the St. Louis Club; that he was with the club during all of the season of 1910, giving that club his exclusive services. He was asked by his counsel, if at all times during the season of 1910, to the best of his ability, he had faithfully and uprightly performed his duties as manager of the club. Counsel for defendant objected, as calling for a conclusion, but admitted that plaintiff was manager of the team for the year 1910 and directed the players. Whereupon the court sustained the objection, saying that the matter of nonperformance was set up in the answer as a defense. Plaintiff also testified that after his discharge in November, 1910, he was unable to obtain any employment during the season of 1911, although he had tried to get "a job in baseball;" that he had never done anything in his life but play baseball, except that in the winter he was in other business; had no employment in 1911, although he tried to obtain it. His life occupation had been that of a ball player; had been in what is known as the "Big League," of which defendant was a member, for twenty-six years.

A letter adressed to plaintiff by Mr. Hedges, as president of defendant, and duly received by plaintiff was read in evidence and is as follows (omitting address):

"November 29, 1910.

"This is to confirm what you have understood for more than a month past, viz., that the St. Louis American League Baseball Company has elected to termi-

nate its contract with you as a member of the St. Louis American League Baseball Club, for the season of 1911, and that you have been tendered an unconditional release. If you desire to learn the reasons for the termination of said contract, I will be pleased to state them to you upon request made by you in writing within the next five days.''

On cross-examination plaintiff was asked as to what took place at the concluding games in which the St. Louis Club played, then playing against the Clevelands. Without setting out this in detail, it is sufficient to say that the matters connected with the game and plaintiff's management of it were gone into with the idea of developing the defense pleaded. These matters are so fully covered by plaintiff's instruction No. 2 and defendant's instruction which was given, that we will not reproduce them here. We refer to those instructions, hereafter set out. It may be said that plaintiff testified that he knew Lajoie and Cobb, and knew that these two men are supposed to be the best ball players in the country; that in the League, in the season of 1910, Cobb led in the batting and Lajoie was second, the difference between them, however, being a mere fraction. He further testified that he had not given Corriden, who played at third base, any special instructions that day as to where he was to play but that he had given all the members of his club instructions ''to play back for Lajoie;'' had given these instructions to his whole infield and outfield; had not given Corriden any special instructions, but gave him and the other members of the team these instructions, because of his knowledge of the hard hitting of Lajoie. In brief, plaintiff denied specifically all the charges set out in the answer, declaring that he had played that game of ball the same as any other game of baseball he had ever played in his life; that it was as square a game as he had ever played and he

had not given any player any instructions that he ought not to have given to have them play an honest game of baseball; had given them the same instructions as in any other game of baseball that he was ever in; had not had any talk or understanding whatever with Lajoie that day or for that game. In this last he was uncontradicted.

The line of defense on cross-examination of plaintiff was to the end of showing that he had endeavored to favor Lajoie by purposely playing Corriden so far back of the third base that balls from Lajoie could not be fielded, all of which plaintiff denied.

Mr. Hedges, testifying for defendant, said he was sitting in the grand stand when this last game was played; had not said anything to plaintiff that day about it; left St. Louis the night it was played. This witness gave no testimony as to the conduct of the game.

Testifying as to the execution of the contract, Mr. Hedges said, in effect, that for the season of 1910, plaintiff was manager of the St. Louis Team and had acted in that capacity under a contract between him and defendant. Producing the constitution of the organization, he read from it a clause to the effect that when the association wished to dispose of a player and give him his unconditional release it was impossible for any one club to do that until they first get the consent of the other seven clubs in the organization and if none of these seven clubs wanted the player then the club which had employed him could release him. That before discharging plaintiff, as he did by his letter of November 29, 1910, he had given all the other seven clubs in the League the refusal of plaintiff, doing this through Mr. Johnson, president of the League, and that none of them wanting plaintiff, he had discharged him; that he did this after consulting with Mr. Johnson, who advised him to get rid of plain-

tiff; that he was "no good as manager." On cross-examination this witness testified that he was the one who had employed O'Connor; that he had had several conversations with him before the contract was signed. Asked if the question was brought up in regard to the duration of the contract and as to how long O'Connor was to sign for, he said that he did not think that he had had any such conversation prior to the signing of the contract; that when the contract was signed he told plaintiff if he proved to be the right man he wanted him for a long time but that if he did not, he did not want him.   Asked what was said in regard to any length of time for the duration of the contract—how long it was to extend, counsel for defendant interposed an objection, as he did to all the questions that were asked this witness on this line, as to what had taken place between him and O'Connor prior to the signing of the contract, or at the time of its signing, but as far as the abstract shows, objection was made by counsel for defendant, but without any reason whatever being assigned for the objection.   The witness was then asked, still on cross-examination, what was the length of contract finally agreed upon before O'Connor signed it.   This was objected to on the ground that the contract was signed and speaks for itself, to which the court said that he thought the witness could testify in reference to his understanding of the terms "1910 and 1911," and that he thought the cross-examination ought to be limited to that. Counsel for defendant asked if he might inquire of the court the theory upon which that evidence was about to go in, to which the court said that he was letting it in on the ground that there "is an ambiguity in the contract; one part relates to two seasons, 1910 and 1911, written in ink, and the other part relates to a specific time," also written in ink.   Whereupon counsel for defendant remarked that the witness

(Hedges) had testified that the blank spaces in the form were written in ink, to which the court replied, "Well, it is for the purpose of getting at this witness's understanding of it; what it meant to him," to which counsel for defendant said that he did not wish to insist upon his "question" particularly, but it "seemed" to him that these previous conversations must be merged in this contract, to which the court said that he thought that was true. Whereupon counsel for defendant remarked: "There is a theory upon which there is no ambiguity in this contract; the contract clearly lacks mutuality," on which the court ruled that the question might be answered, but "that is the theory upon which the court admits it," to which ruling counsel for defendant excepted. This witness was further asked, still on cross-examination, if plaintiff had refused to sign any contract with him (Hedges) unless it was a contract for at least two years, the seasons of 1910 and 1911, to which the witness answered: "I don't think there was ever but one contract entered upon, and that was the contract that was signed." He was then asked whether O'Connor had not refused to sign the contract for one season alone, to which counsel for defendant objected on the ground that the contract is made. This objection was overruled and exception saved and witness answered: "I think he wanted a two-year contract, but I don't think he refused to sign a one-year." He was then asked if he had not finally agreed to give plaintiff a two-year contract. This was objected to but no ground of the objection stated and objection being overruled, witness answered that he gave plaintiff a contract which states in the body of that contract that the contract terminated on or about the 15th day of October, 1910; that he gave him that contract. When his attention was called to the fact that in the first part of the contract, or the first clause of the contract, it read that he was

employed for the seasons of 1910 and 1911, and he was asked to explain that, he stated that that appeared to be a mistake; that it turned out to be one after the last game had been played. This last part of the answer was stricken out.

Mr. Byron Bancroft Johnson, president of the American League, testified that he wrote a letter to plaintiff October 11, 1910, to the effect that his attention had been called by newspaper reports to the Cleveland-St. Louis game played on the preceding Sunday (the 9th); that the papers "boldly assert that the manner in which Lajoie secured his hits made it appear that the players on your team were trying to 'boost' his batting average," and he wanted O'Connor and other named players to submit a statement of the facts and report to him (Johnson) at once. O'Connor and others appeared before Johnson with the result that Johnson recommended to Hedges that he dismiss O'Connor.

Other witnesses for defendant testified to the fact of plaintiff causing Corriden to play some distance back of third base and that Lajoie had "bunted" the balls sent to him so that they fell short of third base and short of where Corriden was playing. The witnesses, however, admitted that they could not tell from the way Lajoie held his bat whether he intended to "bunt" or make a hard hit in any given play.

Plaintiff, called in rebuttal, testified that he had heard the testimony given by Mr. Hedges. He was then asked whether or not, before he signed the contract, he had had a conversation with Mr. Hedges in his office after the price had been agreed upon before he would sign the contract with him that the time would have to be stipulated. He answered, "Yes, sir." Whereupon counsel for defendant objected, stating no ground, and his objection was overruled.

Plaintiff was then asked to state what was said to Mr. Hedges at that time by him. Counsel for defendant said, "I object to that." This objection was also overruled. Whereupon plaintiff testified that Mr. Hedges called him down to his office; that he went down and had a "date" to meet him; that they wrangled about for an hour or an hour and a half about salary and finally agreed on the terms of the salary; that he (plaintiff) wanted a two-years term contract, to which Mr. Hedges said: "Jack, take a one-year contract," to which witness said: "No," whereupon Mr. Hedges said:. "Why do you want a two-year contract?" to which plaintiff answered: "Your club is way down, and it would not give me a chance—by taking a one-year contract it would not give me a chance to show what I could do. . . . Give me a two-year contract and I probably will have a chance to get new ball players for you," to which Mr. Hedges said: "Well, will you give me until to-morrow?" to which plaintiff said: "What do you want to do to-morrow?" Mr. Hedges said, "I want to telephone this gentleman in Cincinnati," giving his name as that of a lawyer and connected with the ball club, "he (Mr. Hedges) says, 'Give me a chance to long-distance this fellow and I will see you to-morrow,' and I says, 'All right,' and he made a date for next day, and I went down to Mr. Hedges and I signed the two-year contract; he said everything was all right." At the conclusion of this counsel for defendant moved that all of this answer be stricken out, especially the last statement to the effect that plaintiff signed the two-year contract. The court ruled that the latter part should be stricken out. Whereupon counsel for defendant announced that he excepted to the ruling of the court in not striking out all of this testimony.

With the exception of the evidence of a newspaper reporter, which in the shape it was endeavored to

be introduced by defendant, was excluded, this was the substance of the evidence in the case.

At the close of the testimony defendant again interposed a demurrer to the evidence which was overruled, defendant excepting.

At the instance of plaintiff the court gave three instructions. The first is as follows:

"The court instructs the jury that if they believe and find from the evidence that plaintiff and defendant entered into a contract whereby defendant agreed to employ plaintiff as manager of the players of defendant club and agreed to pay him the sum of $5000 per season for 1910 and 1911, and that plaintiff agreed to perform for defendant such duties pertaining to the exhibition of the game of baseball as defendant may require of him, at such reasonable times and places, as defendant may designate, and that plaintiff did enter upon the performance of his duties and did, during the season of 1910, perform for defendant such duties pertaining to the exhibition of the game of baseball as defendant required of him, at such reasonable times and places as defendant designated, and that defendant, for the season of 1910, paid plaintiff the sum of $5000 as compensation for services rendered, and that on or about the 29th day of November, 1910, defendant, without just cause or reason, discharged plaintiff and refused to allow him to continue as manager of defendant's players and perform duties pertaining to the exhibition of the game of baseball, for the season of 1911, as defendant might require of him, and that plaintiff was ready, willing and able to perform such duties pertaining to the exhibition of the game of baseball as defendant might require of him, and that he used reasonable diligence to find employment of the character in which he had been employed, and did not find such employment, and that defendant has refused to pay him for the season of 1911, then

your verdict must be for plaintiff in the sum of $5000, less any sum that the jury may believe from the evidence that plaintiff actually earned or might have earned if he had used reasonable diligence to secure other employment."

The second instruction is to the effect that the burden was upon defendant to prove and establish to the satisfaction of the jury by the preponderance or greater weight of the evidence that plaintiff was desirous of favoring Lajoie to the end that Lajoie might be successful in making the highest average for batting honors and in making a higher average than one Cobb, and that plaintiff instructed one Corriden, who played the position of third baseman for defendant, to play so far back of his regular and ordinary position as third baseman as to allow Lajoie to make base hits, and that Lajoie could not and would not have made these hits had not Corriden played so far back of his ordinary and regular position as third baseman.

The third instruction is to the effect that if the jury found from the evidence that on October 9, 1910, the final two games of the series of baseball between the Cleveland Club and defendant were played, and that one Lajoie was a player of the Cleveland Club, and when batting he was capable of and usually hit the ball with great force whereby the ball attained great speed, and that one Corriden was a player of defendant club and had a short time theretofore been employed as a player by defendant, and that he had never before played third base against the Cleveland Club, and that it was customary for plaintiff, as manager of the defendant club, to instruct the players for and during the game as to their duties, and that plaintiff, for the best interests of defendant and for the purpose of winning the last two games on or about October 9, 1910, with the Cleveland Club, advised and warned and instructed Corriden to play back as third

baseman when Lajoie became the batter as the best means of keeping Lajoie from making base hits, and that in so doing plaintiff exercised his best judgment in the interests of defendant, and that plaintiff was not desirous of favoring Lajoie to the end that Lajoie might be successful in making the highest average for batting honors in the League and in making a higher average than Cobb, and that plaintiff did not instruct Corriden as third baseman of defendant club to play so far back of his regular and ordinary position as third baseman as to allow and with intent to allow Lajoie to make base hits, then their verdict must be for plaintiff.

Defendant excepted to the giving of these instructions.

At the request of defendant the court gave an instruction to the effect that if the jury found and believed from the evidence that on or about October 14, 1909, plaintiff and defendant entered into a contract under which plaintiff agreed to render faithful performance to defendant of the duties of manager of defendant's players in the exhibition of the game of baseball for and during the playing season of 1910 and 1911; that the plaintiff while in charge of defendant's team of players as such manager for the purpose of favoring one Lajoie in a contest for batting honors in the American League with Cobb of the Detroit team, or for any purpose other than contesting the game of baseball in good faith, instructed one of the players on defendant's team by the name of Corriden to play so far back of his regular and ordinary position as third baseman on the team of defendant as to allow Lajoie in those games to make what are known as base hits which Lajoie could not and would not have made had it not been for the instructions by plaintiff to Corriden, and that as a result of the giving of these instructions to Corriden and of the fact

O'Connor v. Baseball Co.

that Corriden obeyed these instructions Làjoie succeeded in making base hits which otherwise he would not have made had the ball so hit by Lajoie been properly fielded, then you should find that such acts of plaintiff were in violation of his duty to defendant under the terms of the contract between plaintiff and defendant, and your verdict should be in favor of defendant · and against plaintiff.

The court of its own motion gave the jury the usual instructions as to the credibility of witnesses and the number of jurors necessary to concur in a verdict.

The jury returned a verdict in favor of plaintiff for the sum of $5000, judgment following.

Filing its motion for a new trial and excepting to the action of the court in overruling it, defendant has duly appealed.

REYNOLDS, P. J. (after stating the facts).— Learned counsel for appellant make twelve assignments of error but in their argument they have confined themselves to eight points.

It is first argued that the relationship that exists between an employer and employee is one of peculiar trust and confidence and that where in an action by the latter for breach of the · contract of employment the former pleads facts constituting a fraud on that relationship as a justification. for the employee's discharge, the issue on such fraud is equitable in its nature and that an appellate court will not consider itself bound by the findings of the court or jury below but will review all the evidence of the fraud. We do not appreciate the force of this argument in the case before us. None of the authorities cited by learned counsel for appellant fit this case. This is purely an action at law—an action in which, on all controverted facts, the verdict of the jury is binding upon the ap-

pellate court, if sustained by substantial evidence and the result of correct instructions as to the law. But as in all actions at law, we may review the evidence to determine whether there is substantial evidence to sustain the verdict. Doing that here, we find that the verdict, in so far as it finds there was no legal ground for the discharge of plaintiff, is fully warranted. There is no substantial evidence that plaintiff was desirous of favoring Lajoie in his contest for batting honors over Cobb, or that he, in disregard and in violation of his duties, and to favor Lajoie, instructed Corriden to play so far back of his regular position as to allow Lajoie to make successful hits, and which he could not otherwise have made. To have sustained these charges, the jury would have had to act on the vaguest suspicion. It is true that Lajoie "bunted" and that Corriden, being far back from third base, was not able to handle the balls so "bunted." But the jury must have found that there was no substantial evidence that plaintiff or anyone else could have anticipated, from his manner of holding his bat, that Lajoie intended to "bunt" all of them. Even the fact that he did "bunt" the first evidently did not convince the jury that plaintiff should have anticipated his bunting any others. Failing to satisfy the jury on this very material point, as we must assume from the verdict was the case, defendant was bound to fail in its effort to prove good cause for the discharge of plaintiff.

The second proposition made by those learned counsel is, that where the employee does an act which injures or has a tendency to injure the employer's business, such an act is a sufficient justification of the discharge of the employee, irrespective of fraud, and it is not necessary to show that the act caused actual loss to his employer, if it appears that the latter is liable to be damaged by the act complained of. Coun-

.sel cite in support of this Wade v. Wm. Barr Dry Goods Co., 155 Mo. App. 405, 134 S. W. 1084. However true the proposition that it is not necessary to show actual loss may be, it still remains a question of fact for a jury to determine whether the doing of a particular act was in violation of the employee's duty and did tend to the injury of the employer. So we held when Wade v. Wm. Barr Dry Goods Company again came before us on appeal, as see 191 Mo. App. 629, 177 S. W. 668. As will be seen by the instructions given in this case, the question of whether the plaintiff had violated his duty and been unfaithful to his employer was fairly submitted to the jury; was distinctly presented as an issue by the instructions asked and given at the instance of plaintiff as well as the one asked and given at the instance of defendant.

The third proposition urged by learned counsel is, ''a contract which binds only one party is void for lack of mutuality of obligation.'' This point, as elaborated in the argument of those counsel is, that as the second clause of the contract calls for services only during the season of 1910, and makes no provision for any services for the season of 1911, that therefore there is no mutuality, or no consideration; that plaintiff is under no obligation, by the contract, to do anything for the season of 1911. That proposition must rest on the further proposition that the time set out in this second clause is conclusive. But if it appears that the employment was for the season of 1911 as well as for that of 1910, then there is nothing in this point. To sustain it would be to ignore the fundamental proposition in the case, namely, that the employment, as expressed in the very first clause of the contract, is for two seasons. As by the verdict of the jury, returned under the evidence in the case and the instructions given, the jury found there was an employment for the two

seasons at a stated compensation for each season, the like duties followed for each year and so created a mutuality of contract.

The fourth proposition advanced and argued is that a contract which is void on its face, or which differs from the one pleaded, is not admissible in evidence; that a party cannot recover on a void instrument nor can he sue on one cause of action and recover on another. Very distinctly the plaintiff in this case sued on a two-year contract; very clearly from the testimony in the case he entered into the contract only on the agreement that he was to be employed for two seasons. The contract introduced in evidence, when produced by defendant, very clearly and distinctly, in the first clause, sets out in so many words that the defendant agrees to pay plaintiff "the sum of $5000 per season for 1910 and 1911," whereas the second or following clause limits the employment to the season of 1910, "beginning on or about the 1st day of April, 1910, and ending on or about the 15th day of October, 1910, which period of time shall constitute the life of this contract, unless sooner terminated in accordance with the further provisions of this contract." This does not present a case of ambiguity but of conflicting clauses in the contract, and these two clauses are in irreconcilable conflict. It is to be remembered that this contract was drawn up by the president of the defendant corporation, and, as in all like cases, is to be construed most strongly against the person drawing it. The question then is, which of these clauses is to control? Both cannot stand together. We are not without what we think conclusive authority on this question.

Employers' Liability Assurance Corporation v. Morrow, 74 C. C. A. Rep. 640, is a case on a liability assurance policy, in which policy two clauses appeared, the first promising indemnity in the sum of $10,000

in case of the loss of an arm; the second apparently limiting the amount payable in case of the loss of an arm to a sum which the weekly earnings of the assured bore to the principal sum due.  Judge LURTON, then circuit judge, delivering the opinion of the court and treating of these antagonistic clauses, has said (l. c. 644):

"How, then, can a subsequent provision stand which altogether changes the measure  of such recovery for such an injury from an agreed, definite, fixed amount, by substituting for that a sum to be ascertained by the ratio of his weekly wages to the weekly indemnity contracted to be paid only for a disability not resulting in the loss of a limb?  But if the contract to pay a definite or fixed sum for the loss of an arm is to be abandoned for a sum ascertained by a measure of the kind suggested, then which 'weekly indemnity' payable under this policy, or the other concurrent policy, are we to take as furnishing that factor in the problem?"  After further considering the effect of these antagonistic clauses, Judge LURTON says (l. c. 645):  "It is trifling with the substance of things to say that two such antagonistic clauses can stand together, or that the latter is a mere modification of the other.  If the agreement in the prior clause is antagonistic to the agreement in the later clause, one must yield to the other.  But it is a well-settled principle of construction that if two clauses are repugnant, and cannot stand together, the first will stand and the last will be rejected."  Many authorities are cited in support of this proposition.

In Royle Mining Co. v. Fidelity & Casualty Company of New York, 126 Mo. App. 104, 103 S. W. 1098, the Kansas City Court of Appeals also had before it an employer's liability contract, which, under the general terms of the policy, contracted for the pay-

ment of an amount certain in case of loss or injury to the employee, but under subsequent and following special agreements, this liability to pay was limited, namely, providing that there should be no liability if the injury happened by reason of disregard of the law by the employer in operating his mine. Judge JOHNSON, speaking for the Kansas City Court of Appeals, says that the injury to the employee was undoubtedly occasioned by failure of the employer to comply with the provisions of our statute governing the operation of mines, and under the special agreement there was to be no liability on the assured if that was the cause of the accident. Thereupon Judge JOHNSON (l. c. 111) says:

"Our first concern is with the question of whether or not the special agreement is enforcible at all. If it can be harmonized with the other agreements in the contract, the exemption from liability it provided was of avail to defendant when the question of its liability under the policy first arose, but on the other hand, should we find that its terms are repugnant to those embraced in a preceding part of the contract to which greater weight must be attached in the interpretation of that instrument as a whole, then the proviso under consideration should be rejected *in toto* and the defense founded upon it must fall for lack of support. The main purpose of the contract as expressed on its face was to indemnify plaintiff 'against loss from common law or statutory liability.' That purpose must be given effect, and if the limits attempted to be imposed on it in the subsequent proviso under consideration are so closely drawn that they destroy the expressed purpose of the parties, the prior clause must override the subsequent restrictive clause. The rule announced by Blackstone (2 Blackstone 381) 'that in a deed if there be two clauses so totally repugnant to each other that they cannot stand together,

the first should be received and the latter rejected,'
has been generally followed in the construction of
simple contracts.''

This is followed by the citation of a number of
authorities, both decisions and text-writers, and among
the authorities cited it is to be noted that they include
several of those also cited in Employers' Liability
Assurance Corporation v. Morrow, supra.

Many other authorities might be cited in support
of this proposition but they are so fully collated in
the two opinions above referred to, that by Judge
Lurton of the United States Circuit Court of Appeals,
and that by Judge Johnson of the Kansas City Court
of Appeals, that we do not think it necessary to add
others. So that it follows that these words in this
clause of the contract which purport to limit the em-
ployment to the season of 1910, even independent of
any parol testimony explaining them, are to be entire-
ly disregarded and the contract treated as controlled
by the words in the first clause; that is, an employ-
ment for the seasons of 1910 and 1911. This made it
the contract as pleaded; did not make it a void con-
tract and was no failure of proof. So it was treated
by the jury when under the instructions of the court
and the evidence in the case, they found that the plain-
tiff's employment under the contract was for the term
of two years.

The fifth point urged by learned counsel is that
where by reason of mistake a contract is defective or
fails to express the real intention of the parties, the
remedy is in equity for reformation and that before
either party can recover upon it in an action at law
the equitable remedy for reformation must first be in-
voked in the same or a separate proceeding. That is
a general rule but we do not think it applicable here.
Under the authorities which we have cited, this con-
tract did not need reformation. The latter clause, in

so far as it attempts to fix the employment for the season of 1910, falls out as completely as if not written, leaving a valid contract of employment for two years. The court might have so instructed the jury, but it chose to submit the question of the duration of the contract to the jury. Surely appellant has no cause to complain of this. Had the verdict been otherwise, plaintiff might have had ground for complaint.

This answers the further argument that where an ambiguity appears on the face of an instrument and the ambiguity is patent, the contract must be construed by the court itself, and oral testimony of the intentions and prior negotiations of the parties is not admissible.

It is true that testimony was introduced as to what took place between the parties at the time of the consummation of this contract or immediately before it. It is a question as to whether proper and timely objections were made to this testimony. Certainly the motion of defendant to strike out the testimony of plaintiff as to this, after that testimony had been given, no ground of objection having been made to the question, came too late.

A well-settled rule for the interpretation of contracts is here applicable. Our Supreme Court has said in Tetley v. McElmurry, 201 Mo. 382, l. c. 393-4, 100 S. W. 37:

"Where a contract is equivocal . . . a recognized canon of interpretation is to seek out the construction the parties to the contract placed upon it themselves and apply that."

Here, after the games had been played on the 9th of October, 1910, Mr. Johnson, the president of the American League, of which defendant was a part, writes O'Connor by letter of October 11, 1910, hereinbefore set out, that he has seen newspaper reports reflecting on the good faith of the playing and asks him

to explain.  Thereupon O'Connor and others went to Chicago, met Mr. Johnson and were heard by him, Hedges, president of this defendant club, apparently also participating or advised of it.  The hearing evidently was to determine whether O'Connor should thereafter be permitted to remain with the St. Louis Club.  Johnson ruled that he should not and Hedges acquiescing and under the rules of the association O'Connor was offered to the seven other clubs in the League.  All refused him.  Thereupon Hedges, by letter of November 29, 1910, formally notified O'Connor that the St. Louis American League Baseball Company "elected to terminate its contract with you as a member of the St. Louis American League Baseball Club for the season of 1911 and that you have been tendered an unconditional release."  These proceedings before Johnson and this letter of Hedges are explainable on no other theory than that they understood the employment of O'Connor was for the season of 1911, as well as for that of 1910.  If plaintiff was not then under contract for the season of 1911, why go to all this trouble and expense, for Johnson says he paid the expenses of O'Connor and the others to get them to Chicago, to inquire into the conduct of O'Connor in a season which had ended?  There is no pretense that this inquiry was with a view to employ O'Connor for another season; it was to determine whether his then contract for the season of 1911 should remain in force.  No other construction can be put on the letter of date November 29, 1910, from Hedges to O'Connor, in which the former writes the latter that the purpose of the letter is "to confirm what you (O'Connor) have understood for more than a month past, viz., that the St. Louis American Baseball Company has elected to terminate its contract with you as a member of the St. Louis American League Baseball Club for the season of 1911, and that you have

been tendered an unconditional release." If the contract of employment ended with the season of 1910, all this was uncalled for. Beyond doubt it showed that appellant's officers then construed this contract as covering the season of 1911 as well as of 1910. By its course of conduct alone, if for no other reason, defendant put a construction upon the contract by which it is bound.

The seventh and eighth points made by learned counsel for appellant are to the rejection of the evidence 'attempted to be introduced as to newspaper publications. It is sufficient to say as to these points that an examination of the bill of exceptions as set out in the abstract fails to show that any legal objections were offered to the admissibility of this testimony, nor is the evidence proposed to be offered before us in such shape that we can pass upon its admissibility.

Our conclusion on the whole case is, that the instructions placed the case before the jury in a very favorable light for appellant and we see no cause to disturb the verdict of the jury, nor the judgment of the trial court on that verdict. That judgment is affirmed. *Nortoni* and *Allen, JJ.,* concur.